FILED
2013 Feb-07 PM 02:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JUDY BOYCE and BENJAMIN MONSOD, <br><br> Plaintiffs, <br><br> vs. <br><br> AEGIS THERAPIES, INC., GGNSC Holdings LLC, and LONGWOOD MANAGEMENT CORP., <br><br> Defendants. | Civil Action No. <br><br><br><br><br><br> **FILED UNDER SEAL** <br> **Pursuant to 31 U.S.C. § 3730(b)(2)** |

## COMPLAINT

*Qui tam* relators Judy Boyce ("Boyce") and Benjamin Monsod ("Monsod" and, together with Boyce, "Relators"), bring this action under the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA") on behalf of the United States of America against Defendants Aegis Therapies, Inc. ("Aegis"), GGNSC Holdings LLC ("Golden Living"), and Longwood Management Corp. ("Longwood" and, collectively with Aegis and Golden Living, "Defendants"). Relators' allegations are based upon their own knowledge and upon an investigation undertaken by them through counsel. Relators allege as follows:

### I. NATURE OF THE CASE

1. This *qui tam* action is an effort to restore to the United States millions of dollars Defendants have taken through a systemic and longstanding fraud, perpetrated through Medicare Parts A and B and through Medicaid.

2. Medicare and Medicaid reimburse providers of physical, speech, and/or occupational therapy only to the extent that such therapy is medically necessary. Therapy is not medically necessary where a patient cannot benefit from it, for example, because more therapy is

being performed than the patient can tolerate (based on the patient's physical condition), or because the patient's condition is such that they will never improve regardless of how much therapy is performed.

3. Defendant Aegis has created and implemented a system whereby it directs therapists to perform and bill for therapy regardless of whether patients need or are benefitting from that therapy. Aegis then submits bills for the therapy to the facilities in which its therapists work, causing those facilities to, in turn, submit false claims to Medicare and Medicaid.

4. Aegis's actions are well-known to its clientele, including Defendants Golden Living and Longwood. Indeed, part of Aegis's marketing tactics include telling skilled nursing facilities ("SNFs") that it can raise their Medicare reimbursement rates. Further, employees of the SNFs that are serviced by Aegis act in concert with Aegis employees to carry out the fraud.

5. This scheme has gone on for years and, on information and belief, continues to this day.

## II. PARTIES AND RELEVANT NON-PARTIES

6. Defendant Aegis Therapies, Inc., is a corporation organized and existing under the laws of the state of Delaware, with its headquarters and principal place of business at 1000 Fianna Way, Fort Smith, Arkansas 72919. Aegis provides occupational, rehabilitative, and physical therapy at SNFs and other locations throughout the United States, including in this District.

7. Defendant GGNSC Holdings LLC is a limited liability corporation organized and existing under the laws of the state of Delaware, with its headquarters at 1000 Fianna Way, Fort Smith, Arkansas 72919. GGNSC owns and operates hundreds of SNFs throughout the country, under the name "Golden Living," including in this District. Many such Golden Living facilities have Aegis locations either on-site or nearby.

2


Case 2:16-cv-08050-SVW-FFM Document 40 Filed 10/28/16 Page 3 of 20 Page ID #:199

8. Both Aegis and Golden Living are owned by non-Party Fillmore Capital Partners, LLC, a private equity firm organized under the laws of the state of Delaware, with its headquarters and principal place of business at 4 Embarcadero Center, Suite 710, San Francisco, California 94111.

9. Relator Judy Boyce is a natural person residing in the state of Kansas. Ms. Boyce was the Social Service Director of the Golden Living Center in Cottonwood Falls, Kansas, from 2004 until 2007, and was the Executive Director of that facility from 2007 until August of 2010. The Cottonwood Falls facility has an Aegis facility on-site that treats both in- and out-patients. Through her employment at the Cottonwood Falls facility, Ms. Boyce gained first-hand knowledge of the fraud described herein.

10. Defendant Longwood Management Corporation owns and operates approximately 40 skilled nursing facilities throughout California. Longwood employs the services of Aegis at some of those facilities, including the Montrose Healthcare Center.

11. Relator Benjamin Monsod is a natural person residing in the state of California. From January of 2010 to April of 2012, Mr. Monsod was employed as an MDS Coordinator at Montrose Healthcare Center, a facility owned and operated by Longwood. Through his employment at the Montrose facility, Mr. Monsod gained first-hand knowledge of the fraudulent scheme described herein.

12. The United States is a real party in interest under the FCA and ultimately paid the false claims alleged herein -- Medicare claims in full and Medicaid claims in part -- and is entitled to the bulk of the recovery sought by this action. Medicare is a federal health insurance program administered by CMS for the elderly and disabled. *See* 42 U.S.C. §§ 1395-1395hhh.


3

Medicaid is a jointly-funded federal and state public-assistance program that pays for certain medical expenses incurred by low-income patients. *See* 42 U.S.C. §§ 1396-1396v.

### III. JURISDICTION AND VENUE

13. Relators bring this action on behalf of the United States under the *qui tam* provisions of the FCA.

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which confer jurisdiction over actions brought under 31 U.S.C §§ 3729 and 3730.

15. This Court has personal jurisdiction over Defendants, and venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because one or more Defendants transact business and committed violations of 31 U.S.C. § 3729 in this District.

16. This action is not based upon prior public disclosure of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; in the news media; or in any other form, as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A).

17. To the extent there has been a public disclosure unknown to Relators, they are an original source under all relevant statutory provisions. Relators, prior to any such public disclosure, voluntarily disclosed to the Government the information on which their allegations are based and/or have knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions and voluntarily provided the information to the Government before filing this action.

4

DOCS\649716v2

## IV. RELEVANT STATUTES AND REGULATIONS

### A. THE FALSE CLAIMS ACT

18. The FCA imposes liability on any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval ("false claim"). 31 U.S.C. § 3729(a)(1)(A). The FCA defines "claim" to include any request or demand, whether under contract or otherwise, for money, that is made to an agent of the United States or to a contractor, if the money is to be spent to advance a government program or interest and the government provides or will reimburse any portion of the money. 31 U.S.C. § 3729(b)(2). The FCA defines "knowingly" to mean actual knowledge, deliberate ignorance of truth or falsity, or reckless disregard of truth or falsity; specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1).

19. The FCA also imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim ("false statement"). 31 U.S.C. § 3729(a)(1)(B). The FCA defines "material" to mean having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

20. The FCA also imposes liability on any person who conspires to commit false claims or false statements ("conspiracy claim"). 31 U.S.C. § 3729(a)(1)(C).

### B. MEDICARE

21. Medicare is a federal health insurance program created by Congress in 1965 for the elderly and disabled. *See* 42 U.S.C. §§ 1395-1395hhh. It is the nation's largest health insurance program and covers nearly 40 million people. Medicare pays doctors, hospitals, pharmacies, and other providers and suppliers of medical goods and services according to government-established conditions and rates. *Id.* Medicare Part A is hospital insurance that helps cover certain types of care provided by institutional providers within specified limits,

5

including phsyical, occupational, and speech therapy provided on an in-patient basis at SNFs. *See* 42 U.S.C. § 1395c.

22. Medicare Part A is a prospective payment system that reimburses SNFs, among other things, for post-hospital physical, occupational, and speech therapy provided on an in-patient basis. 42 CFR 409.20 Specifically, Medicare Part A reimburses SNFs on a *per diem* basis for each in-patient serviced by the SNF.

23. The rate of reimbursement for each patient is determined by that patient's Resource Utilization Group ("RUG") level. Generally speaking, the PPS *per diem* for each RUG is established based on payments made by the SNF for allowable costs under Part A and Part B during applicable cost reporting periods. Such allowable costs include, among other things, the cost of skilled therapy services. The more therapy a patient requires, the higher that patient's RUG level will be and, accordingly, the more money Medicare will provide the SNF to reimburse it for patient care. *See generally* 42 C.F.R. §§ 413.335, 413.337.

24. Each RUG level is also impacted by an Activities of Daily Living ("ADL") score. The ADL categories reflect the amount of assistance a patient typically needs throughout the day -- for example, whether a patient is totally bed-ridden, needs assistance eating or using the toilet, and so forth. Together, the amount of therapy required by a patient, and the patient's ADL score, combine to form a RUG level

25. Medicare Part B is a per-service payment system that reimburses SNFs, among other things, for therapy provided on an out-patient basis, or, in some instances, for therapy provided on an in-patient basis, to individuals whose Part A coverage has been expended. The criteria for coverage of services is the same under Part B as it is under Part A.

26. Regardless of which portion of Medicare is billed for therapeutic services, such services must be provided in accordance with a plan created by a physician, nurse practitioner, clinical nurse specialist, physician assistant, or the therapist furnishing the services. 42 CFR 409.17; 42 CFR 409.23. Among other things, the plan must prescribe the type, amount, frequency, and duration of the therapy to be provided. 42 CFR 409.17.

27. SNFs may elect to contract with third party suppliers of therapy, such as Aegis, to provide care to their residents. These contracts are commonly referred to as "under arrangement" contracts. When an SNF enters into an under arrangement contract with a therapy services supplier, the supplier submits invoices to the SNF for the services it provides to residents, and the SNF then submits the claim for those services to Medicare. The cost to an SNF pursuant to an "under arrangement" is included in Medicare payments to that SNF, either as part of the relevant patients' RUG levels under Part A, or on a per-service basis pursuant to Part B.

28. Claims for reimbursement for skilled therapy services provided in SNFs are submitted to Medicare on Claim Form 1450 or its electronic equivalent. At the end of its annual cost reporting period, the SNF must submit cost reports detailing the expenses and revenues for its facility along with the patient activity. The SNF is required to accurately report its actual payments to suppliers, including the skilled therapy providers.

29. The annual cost report is the final claim for payment and is submitted on CMS Form 2540-96 (unless the facility qualifies for a simplified cost report on Form 2540s). Annual cost reports constitute the final accounting of the facility's federal program reimbursement. The United States relies upon the annual cost report to determine whether the provider is entitled to

7

more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare, Medicaid or other government programs.

30. In order to receive payment, the SNF must certify that all data in its annual cost report is accurately and truthfully reported and that it has complied with all applicable laws and regulations. The cost report requires the SNF employee or agent submitting the report to certify that he or she has read a statement that states in pertinent part: "If services identified in this cost report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result." The employee must further certify that:

> I have examined the accompanying electronically filed or manually submitted cost report and the balance sheet and statement of revenue and expenses ... and that to the best of my knowledge and belief it is a true, correct, and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

31. Where an SNF is part of a chain, the chain's headquarters must similarly submit an annual cost report. That submission similarly requires an officer to certify his or her understanding that: "If services identified in this cost report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result."

### C. COMPLIANCE WITH MEDICARE REGULATIONS IS A PREREQUISITE FOR PAYMENT UNDER BOTH PROGRAMS

32. To be eligible to collect Medicare or Medicaid payments, a provider must enroll with those programs by submitting a Form CMS-855B application and supporting

8

documentation to Medicare.[1] Among other things, that form provides "additional requirements that [] supplier[s] must meet and maintain in order to bill the Medicare program." These requirements, which are prerequisites to payment under Medicare, include a certification that: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare." CMS-855A, at 31. The provider also certifies that *"I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."* Id. (emphasis added).

33. Similarly, Medicaid regulations require that all provider claim forms include the following statements near the provider's signature: "This is to certify that the foregoing information is true, accurate, and complete. I understand that payment of this claim will be from Federal and State funds, and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws." 42 CFR 455.18.

34. Claims for payment submitted to the Government in knowing violation of any material rules or requirements constitute false claims for purposes of the FCA. By the same token, certifications falsely attesting to compliance with such material requirements constitute false statements. Additionally, any person knowingly assisting or participating in the violation of material requirements is liable under the conspiracy provisions of the FCA.

---

[1] Form CMS-855A is accessible at http://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms855a.pdf (last accessed February 4, 2013).

9

## V. DEFENDANTS' FRAUDULENT CONDUCT

35.     Aegis provides skilled therapy services on an in-patient basis to patients at SNFs, pursuant to "under arrangement" contracts like those described above. Although Aegis provides services to Golden Living facilities, it also services other, non-Golden Living facilities. In both cases, Aegis's facilities are located either within the same building as the SNF, or very close by (for example, across the parking lot, or next door). Aegis also provides skilled therapy services on an out-patient basis at the same facilities.

36.     Defendants conspired to, have, and on information and belief, continue to defraud Medicare by billing for "therapy" that was not provided, and by billing for therapy that was not medically necessary. Additionally, Defendant Aegis has caused other, non-party SNFs to submit false claims to Medicare.

37.     Defendants have engaged in this scheme both to enrich themselves directly and to further Aegis's efforts to win contracts with other SNFs. Indeed, Aegis's marketing program explicitly focuses on its ability to increase Medicare payments to participating SNFs, and at least one former employee interviewed by Relators' counsel noted that SNFs "pressured" Aegis to increase RUG levels of participating patients.

38.     Defendants' fraud emanates from their headquarters and percolates through their companies to the therapists, who are low-level, hourly employees. Simply put, Defendants have inverted the proper methodology for determining RUG levels. Rather than a therapist assessing a patient and determining the appropriate amount of therapy, Defendants begin by asking themselves what RUG level would be most profitable to them, then take steps to shoehorn patients into those RUG levels, either by performing therapy that is not needed, or by couching certain activities as "therapy" when they plainly are not.

10

39.     To further this fraud, Defendants' employees conducted two weekly telephone conference calls. The first was dedicated to the discussion of patients' RUG levels, and centered on how to increase those scores based on two things: 1) alteration of the Plans of Care developed by physical therapists in order to include medically unnecessary therapy; and 2) a *post hoc* review of nurse's and therapists' notes aimed at artificially inflating the amount of therapy apparently provided. The second call was dedicated to a review of the financials of various facilities, and to insuring that each facility retained an adequate number of Medicare patients to further the scheme.

## Manipulation of RUG levels at Golden Living

40.     As set forth above, Medicare requires that a plan for therapy be created by a physician, nurse practicioner, or the therapist providing the services. At Aegis, the treating therapist creates the initial plan in conjunction with an MDS coordinator, who is a registered nurse (not a nurse practitioner). However, the initial plan is then subject to review and alteration by people higher in the corporate hierarchy -- people who are neither nurse practitioners, physicians, nor treating therapists. These people have only one goal -- to make sure that sufficient "treatment" is being rendered to the patient to ensure that targeted RUG levels are met for each facility.

41.     Specifically, the process at the Cottonwood Falls Facility operated as follows. First, the resident or out-patient's attending physician (who was not employed by Defendants and not party to the fraudulent scheme) would recommend a particular type of therapy, for example range of motion therapy. These recommendations specified only that therapy was needed, not how much or of what intensity, which is the province of a licensed physical therapist.

11

42. Once a patient was determined to need therapy, either Krista Dorsey, a licensed physical therapist employed by Aegis, or Becky Lane, a certified physical therapist employed by Aegis, would develop a Plan of Care ("PoC"). The PoC would be based on a physical assessment of the patient, including the patient's capacity for therapy, meaning how much therapy the patient could reasonably benefit from each week, at what intensity, and so forth.

43. Once the PoC had been established by either Ms. Dorsey or Ms. Lane, it was then subject to review by an "MDS Coordinator." These MDS Coordinators were registered nurses employed by Golden Living. Their job was two-fold. First, they were responsible for coding bills for therapy to be submitted to Medicare. Second, although they were registered nurses and not nurse practitioners, and although, as set forth above, a registered nurse is not qualified to establish a PoC, see 42 CFR 409.17, they were tasked with reviewing the PoCs and pressuring the physical therapists to alter the PoCs so that additional treatment, or treatment of a higher intensity, was called for in the PoC.

44. Relator Boyce personally witnessed multiple disputes between the physical therapists and the MDS Coordinators on this topic. However, the physical therapists, fearing for their jobs, ultimately acquiesced in the changes. Each week, Relator Boyce, in her capacity as Executive Director of the Cottonwood Falls Facility, participated in a call with the following individuals:

- Stacy Cardenas, Director of Operations at Golden Living for District 10;
- Vicki Vandemant, Director of Operations at Aegis for District 10;
- Shelly Sima, MDS Consultant at Golden Living;
- An MDS Coordinator, who was employed by Golden Living at the Cottonwood Falls Facility and answered to Ms. Sima; and
- Ms. Lane

12

45. On this call, the PoCs developed by Ms. Lane and/or Dorsey were reviewed by the larger group, including the MDS Coordinators and Ms. Sima, who oversaw the MDS Coordinators. The MDS Coordinators -- acting on orders from Ms. Sima and her supervisor, Ms. Cardenas -- routinely demanded changes to the PoCs that were designed solely to increase RUG levels. For example, Ms. Sima would often claim that a patient should receive 30 minutes of therapy during a session rather than 20 minutes. If asked why this was necessary, the MDS Coordinators, or Ms. Sima herself, would simply reply that such an increase would result in a higher RUG level.

46. As set forth above, the MDS Coordinators reported to Ms. Sima, who in turn reported to Ms. Cardenas. Ms. Sima's role on the phone call was two-fold. First, it was made clear, both to Relator Boyce and to the physical therapists, that part of Ms. Sima's job was to terminate the employment of anyone who provided too much resistance to the MDS Coordinators. Second, Ms. Sima engaged in a *post-hoc* analysis of the nurse's notes and other materials contained in the computerized patient file (which was accessed by the MDS Coordinators and reviewed by everyone on the call) in order to further artificially increase RUG levels by recharacterizing events that had already occurred. This practice was referred to as "capturing" money.

47. In one particularly telling example, Relator Boyce recalls a conversation in which the notes revealed that a nurse -- not a physical therapist -- had helped a patient get dressed. Ms. Sima ordered the MDS Coordinators -- in the presence of all the other participants on the call, including Relator Boyce, Ms. Cardenas and Ms. Vandemant -- to bill that incident as "range of motion therapy." The MDS Coordinators complied.

DOCS\649716v2

48. Relator Boyce also participated in a separate weekly call that included the Executive Directors of the approximately ten other facilities in her District, as well as Ms. Cardenas (and, on some occasions, Ms. Sima and/or the Directors of Nursing at the various facilities). That call was dedicated primarily to a review of the finances of each facility, for example, ensuring that each facility stayed within its food budget. On those calls, Relator Boyce was informed that Golden Living reaped substantially larger profits from rooms provided to Medicare patients than it did from rooms provided to privately insured patients. For this reason, each facility was required to maintain a minimum number of Medicare patients at all times.

49. Additionally, although this second call was dedicated primarily to broader financial issues, the aforementioned fraudulent scheme was occasionally discussed amongst all of the Executive Directors. For example, Relator Boyce recalls one such call in which Ms. Cardenas, in consultation with Ms. Sima, instructed the Executive Directors that the act of removing an adult diaper from a patient and helping them to the bathroom should be billed as "retraining the bladder."

50. By virtue of her position as an Executive Director, Relator Boyce was required to attend meetings both at the district and regional level, where she spoke with other Executive Directors, including Executive Directors from other districts. At those meetings, Relator Boyce learned that the events at the Cottonwood Falls Facility were not an anomaly -- to the contrary, the practices described above were prevalent throughout the company.

51. On information and belief, a comparison of nurses' notes and other contemporaneously kept information against the bills submitted to Medicare will reveal hundreds, if not thousands, of fraudulent submissions.

14

## Manipulation of RUG and ADL Scores at Longwood

52. Relator Monsod's experience at Longwood reflects the same scheme. As set forth above, Relator Monsod was a Registered Nurse employed as an MDS Coordinator at the Montrose facility in California. In that capacity, Relator Monsod worked both with therapists and nursing assistants to establish RUG levels and ADL scores.

53. Specifically, when a patient was first admitted to Longwood, a physical or speech therapist was assigned to determine whether the patient qualified for therapy and, if so, to develop a PoC. This PoC included the projected number of days or minutes of therapy per week that the patient would require, which, in turn, impacted the RUG level. All of the therapists employed at the Montrose facility answered to the Director of Therapy, Maura Rey. Ms. Rey was an employee of Aegis.

54. Additionally, a certified nursing assistant employed by Longwood would document the patient's ADL, which also impacts the RUG level.

55. Both the ADL and the number of minutes of therapy, as well as the supporting documentation, were then transmitted to Relator Monsod, whose job was to input the ADL and minutes of therapy into a computer system known as Accucare. Prior to doing so, however, it was Relator Monsod's job to interview the patients, purportedly to make his own assessment as to the accuracy of the information provided. Relator Monsod consistently observed that both the number of minutes of therapy and the ADLs were consistently inflated in order to artificially increase the RUG level.

56. For example, on several occasions Relator Monsod was confronted with patients who were bed-ridden and dying, but had been prescribed over 700 minutes of therapy each week -- far more than the patients could either tolerate or benefit from. When Relator Monsod

15

confronted the therapist about this, the therapist candidly admitted that her assessment had been based solely on the fact that Longwood would receive more money if the patient was prescribed more therapy.

57. On another occasion, a therapist stated, in the presence of Relator Monsod and his superiors, that she had backdated the number of days of therapy provided to a patient in order to artificially increase the patient's RUG level.

58. Relator Monsod also observed that the certified nursing assistants consistently exaggerated the amount of care each patient required, thus inflating each patient's ADL score. Indeed, although there are four different possible ADL scores, it was extremely rare for any but the most lucrative two to be used.

59. Relator Monsod repeatedly informed his superiors of these problems. Specifically, Relator Monsod informed both Nasreen Pervaiz, the Administrator of the Montrose facility, and Ashley Shoemaker, an MDS Consultant employed by Longwood.

60. Rather than correcting the problems, however, Relator's superiors exacerbated them. Specifically, Relator was told to defer to the "assessments" made by the certified nursing assistants, even though Relator Monsod's medical training exceeds theirs. Indeed, Relator Monsod was explicitly told by Ms. Shoemaker to "find" a way to raise ADL scores if doing so would result in higher RUG levels.

61. In another instance, Ms. Shoemaker and Nasreen Pervaiz reprimanded Relator for refusing to code a patient as being in isolation, which would have had an extremely lucrative impact on that patient's ADL score and, in turn, RUG level. Specifically, Relator discovered that a patient who had previously been coded as being in isolation was living in the same room with another patient. Although the relevant guidelines plainly state that "isolation" means

16

exactly what one would think -- that a patient is not sharing a room with anyone else -- Relator Monsod was reprimanded by Ms. Shoemaker for removing the "isolation" designation from the patient. Ms. Shoemaker explicitly told Relator that this was because of the loss of revenue that would result.

62. Confidential witnesses further bolster the conclusion that these problems are company-wide.

63. CW1 was a part time speech therapist employed by Aegis from 2002 to 2011. In that capacity, CW1 was required to treat other Aegis therapists' patients on weekends. CW1 would therefore review the relevant files at the various facilities CW1 visited. Those files indicated levels of therapy that were simply untenable for the relevant patient. For example, CW1 recalled a patient who was severely demented, but whose PoC called for sixty minutes of ultra-high speech therapy -- something that was plainly impossible. CW1 related that this was a recurring problem, and that the majority of the patients CW1 saw were either severely demented or dissociated. CW1 also noted that these patients were almost always Medicare patients. As CW1 put it, "I would think 'How in the hell is this patient being seen for 60 minutes, 5 days a week, when I could barely get the patient to do [30 minutes]." CW1 saw similar issues throughout the Washington, D.C., Maryland, Virginia and Ohio regions.

64. CW2 was a District Manager employed by Aegis in Wisconsin from 2005 to 2009. CW2 stated that CW2 recalled instances in which therapists were pressured to put patients into ultra-high RUG categories, and further explained that CW2's superiors (who were Directors of Operations) "would come down and ask, looking at financials. The main area where financials can be affected is in the rehab side; so why don't we have 72% of our people at an Ultra High level - why don't we have 60% at the Ultra High level? That's how it was budgeted,

17

and then they tried to get the patients to fit their numbers . . . we had budgeted numbers that we tried to shoot for. If we had 50% budgeted for Ultra-high, that was our goal to try to make sure we provided everything clinical to get to an Ultra-high or very high level . . .." CW2 further noted that "non-affiliated customers," that is, SNFs other than Golden Living, put pressure on Aegis to increase RUG levels.

65. As set forth above, both the RUG and ADL scores are transmitted to CMS. At the Montrose Facility, this was done by Relator Monsod who, after inputting the relevant codes, used Accucare software to transmit them to CMS and, ultimately, on to Medicare for payment.

66. At the Cottonwood Falls facility, the RUG and ADL scores, once manipulated by the MDS Coordinators, are transmitted to Golden Living's Headquarters in Fort Smith, Arkansas. From there, Golden Living personnel transmit them to CMS for reimbursement.

## COUNT I: FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(1)(A), (B) and (C) AGAINST ALL DEFENDANTS

67. Relators repeat and reallege each and every allegation contained in paragraphs 1 through 66 of this Complaint as if set forth herein at length.

68. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B).

69. By engaging in the misconduct alleged herein, Defendants knowingly presented, or caused to be presented, to the United States false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

70. By engaging in the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

18

71. By engaging in the misconduct alleged herein, Defendants conspired with one another to violate 31 U.S.C. § 3729(a)(1)(A) and (B), in violation of § 3729(a)(1)(C).

72. The United States, unaware of the false or fraudulent nature of these claims, paid such claims when it would not otherwise have done so if it had known the truth.

73. By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relators pray that judgment be entered against the Defendant, ordering that:

A. Defendants cease and desist from violating the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*;

B. Defendants pay the United States not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendant's misconduct;

C. Relators be awarded the maximum relator's share allowable pursuant to 31 U.S.C. § 3730(d);

D. Relators be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

E. The United States and Relators be awarded such other, further or different relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Relators hereby demand trial by jury.

DOCS\649716v2

/s/ G. Douglas Jones, Esq.
gdj@hsy.com
**Haskell Slaughter Young & Rediker, LLC**
2001 Park Place, Suite 1400
Birmingham, AL 35203
Tel: 205.834.9829
Fax: 205.324.1133

Roland W. Riggs, Esq.
rriggs@milberg.com
Peggy Wedgworth, Esq.
pwedgworth@milberg.com
**MILBERG LLP**
One Pennsylvania Plaza
New York, New York 10119-0165
Tel: 212.594.5300
Fax: 212.868.1229

*Attorneys for Plaintiffs-Relators*

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing by U.S. mail to the following on this ___ of February, 2013

Jason Ehrlinspiel
Assistant United States Attorney
U.S. Attorney's Office
1801 Fourth Avenue North
Birmingham, Alabama 35203

Eric H. Holder, Jr.
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

I further hereby certify that under the dictates of 18 U.S.C. § 3730(b)(2) and Fed. R. Civ. P. 4(d)(4), the instant Complaint has been served only upon the foregoing party and not upon Defendants.